**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ANTON THURMAN MCALLISTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19cv13 |
| | ) | |
| WINSTON-SALEM POLICE DEPARTMENT, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on Defendants Nolan Terrance Johnson, H.M. Bryant, J.A. Henry, J.F. Sullivan, P.M. Felske, Sgt. D.T. Lentz, C.R. Helf, and Chris Ingram's Motion for Summary Judgment (Docket Entry 76 ("Summary Judgment Motion"); see also Docket Entry 77 ("Supporting Brief")). For the reasons that follow, the Court should grant the Summary Judgment Motion.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

As the Court recounted in a prior Opinion:

Anton Thurman McAllister (the "Plaintiff"), acting pro se, initiated this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against the Winston-Salem Police Department; Forsyth County, North Carolina; the City of Winston-Salem, North Carolina; and twenty-two law-enforcement officers, alleging that "the officers engaged in a wide-ranging conspiracy with Tia Leonard, Plaintiff's then-girlfriend's mother, to have him arrested, charged, and prosecuted for the forcible rape, sexual assault, and felony strangulation of her daughter" (Docket Entry 4 at 1). (See Docket Entry 2 (the "Original Complaint") at 1-3, 5-8, 32.) Upon screening pursuant to 28 U.S.C. § 1915A(a), the undersigned United States Magistrate

Judge recommended that the Court allow only certain claims to proceed, based on Plaintiff's failure to state a claim as to some of the officers. (See Docket Entry 4 at 1-2, 14.) The Court (per Chief United States District Judge Thomas D. Schroeder) adopted that recommendation (over Plaintiff's objection (see Docket Entry 6)), such that only "Plaintiff's claims against Defendants Nolan Johnson, H.M. Bryant, J.A. Henry, J.F. Sullivan, P.M. Felske, Sgt. D.T. Lentz, C.R. Helf, and Chris Ingram [(collectively, 'Defendants')]" (Docket Entry 7 at 1) survived initial screening.

Shortly thereafter, Plaintiff moved to amend the Original Complaint[,] . . . [and] the undersigned screened the [new and now] Operative Complaint, noting that "it presented the same basic claims against Defendants as alleged in the Original Complaint, which the Court previously allowed to proceed, but also sought to revive the dismissed claims and to add claims against a new defendant." (Docket Entry 16 at 2-3.) The undersigned recommended that the Court reject that effort, dismissing the revived and novel claims for failure to state a claim. (See id. at 6.) The Court (per United States District Judge Catherine C. Eagles) likewise adopted that recommendation (again over Plaintiff's objection (see Docket Entry 26)). (See Docket Entry 28.)

According to the Operative Complaint:

On February 16, 2015, Defendant Henry approached Plaintiff and questioned him about a matter involving a moped while concealing the true purpose of the questioning (i.e., "serious allegations against Plaintiff" (Docket Entry 18 at 14)). (See id. at 11, 14.) After Plaintiff "refused to go with Defendant Henry without probable cause" (id.), Defendant Henry conspired with Defendant Bryant to transport Plaintiff to the police station (see id. at 14-15), where Defendant Johnson and Defendant Sullivan elicited a confession from Plaintiff (see id. at 16-18). During the exchange that led to that confession, neither Defendant Johnson nor Defendant Sullivan provided Plaintiff with Miranda warnings. (See id. at 16, 18.) Defendant Henry similarly deprived Plaintiff of such information and denied him assistance by counsel. (See id. at 14.) Defendant Bryant failed to remedy that misconduct by Defendant Henry. (See id. at 14-15.) In connection with his effort to obtain a confession from Plaintiff, Defendant Sullivan also misinformed Plaintiff about the nature of the charges he faced. (See id. at 17-18 (explaining that Defendant Sullivan denied rape accusation against Plaintiff).)

Plaintiff's confession led to his wrongful arrest and detention on (unspecified) excessive bail. (See id. at 13–15.) During the 18 months that elapsed before Plaintiff went to trial on charges of rape, sexual assault, kidnapping, and strangulation, Defendants engaged in other wrongdoing. (See id.) In particular, Defendant Johnson (i) falsified a police report, (ii) allowed Plaintiff's accuser to continue purchasing and using heroin, (iii) mishandled evidence at the crime scene, and (iv) wrongfully deleted pictures and information from Plaintiff's Facebook account (including potentially exculpatory evidence). (See id. at 16–17.) Additionally, Defendant Felske improperly coached Plaintiff's accuser and allowed her to tamper with the crime scene. (See id. at 18–19.) Defendant Helf accompanied Defendant Felske to meet with Plaintiff's accuser and likewise failed to preserve evidence. (See id. at 20.) Defendant Lentz, as a supervisor, "aided and abetted Defendant Felske and Defendant Helf" in the foregoing misconduct. (See id. at 21.) Finally, Defendant Ingram disregarded exculpatory evidence at the crime scene and fabricated investigative reports. (See id. at 24.)

As a result, Plaintiff received an unfair trial that resulted in his conviction of assault on a female (but acquittal of all other charges) (see id. at 13), for which conviction he served 30 months (as a detainee, prisoner, and parolee) (see id. at 26–28). Plaintiff has attributed pain and suffering, as well as a diagnosis of post-traumatic stress disorder, to his wrongful arrest, prosecution, and conviction. (See id. at 17.) Based on those allegations, Plaintiff has asserted that Defendants violated the Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Fourteenth Amendments. (See id. at 7.)

Defendants answered the Operative Complaint, denying allegations of wrongdoing and invoking various affirmative defenses. (See Docket Entries 39, 45, 49.) The parties thereafter engaged in discovery. (See Text Order dated Feb. 18, 2020 (adopting Scheduling Order).) A few weeks later, Defendants moved to stay proceedings in this case on the grounds that the criminal prosecution of Plaintiff in North Carolina state court (which formed the basis for the allegations in the Operative Complaint) remained pending. (See Docket Entry 47 (the "First Motion to Stay"); see also Docket Entries 48 (supporting memorandum), 48-1 (the "State Court Order") (denying suppression motion in Plaintiff's criminal case).)

. . . .

The Court (per the undersigned) granted the First Motion to Stay. (See Text Order dated May 4, 2020 (noting lack of timely opposition by Plaintiff).) Several months later, Defendants filed a notice indicating that, on September 25, 2020, the North Carolina Supreme Court had issued a decision regarding Plaintiff's criminal case. (See Docket Entry 50 (the "Notice"); see also Docket Entry 50-1 (copy of decision).) The North Carolina Supreme Court reversed the finding of no error by the North Carolina Court of Appeals, remanding the case to Forsyth County Superior Court, State v. McAllister, 375 N.C. 455, 456, 847 S.E.2d 711, 712 (2020), with instructions to address the issues underlying potential ineffective assistance of counsel by Plaintiff's criminal defense attorney at trial (i.e., to "determin[e] whether [Plaintiff] knowingly consented in advance to his attorney's admission of guilt to the assault on a female charge," id. at 477, 847 S.E.2d at 725. . . .

The day after filing the Notice, Defendants again moved to stay proceedings in this case. (See Docket Entry 51 (the "Second Motion to Stay"); see also Docket Entry 52 (supporting memorandum).) Because the North Carolina Supreme Court had remanded Plaintiff's criminal case . . ., Defendants asserted that "the state criminal proceedings are ongoing and may not reach a final resolution for some time." (Docket Entry 52 at 3.) The Court (per the undersigned) granted the Second Motion to Stay. (See Text Order dated Nov. 6, 2020 (noting lack of timely opposition by Plaintiff).) Defendants thereafter filed a pair of status reports, indicating that Plaintiff's criminal case remained pending, with no trial date set. (See Docket Entries 54, 55.)

In November 2021, Defendants filed another status report, advising that Plaintiff had pleaded "guilty to involuntary manslaughter in Case No. 20 CRS 57597 [(the "2020 Case")] . . . in a plea deal to resolve outstanding criminal charges" (Docket Entry 57 at 1). More specifically, according to Defendants, "the Forsyth County District Attorney's Office reported that Plaintiff had agreed to plead guilty to involuntary manslaughter in the 2020 Case 'in exchange for a dismissal' of the [assault charge remanded by the Supreme Court]" (id.). Defendants attached as an exhibit a copy of the public record documenting the dismissal of th[at charge] in a manner consistent with the report from the Forsyth County District Attorney's Office. (See Docket Entry 57-1 (the "Dismissal Form") at 2 (bearing signature of prosecutor "EF DRESEL" as well as "filed" stamp of Forsyth County Clerk of Superior Court).) "The Dismissal Form also notes that

4

> Plaintiff had 'served all available time on the [a]ssault [c]harge[] and can get no more punishment even if [the] case was retried; further prosecution not in the public interest.'" (Docket Entry 57 at 2 (quoting Docket Entry 57-1 at 2).)
>
> The Court (per the undersigned) lifted the stay and reset several discovery deadlines. (See Text Order dated Nov. 8, 2021.) Shortly thereafter, Defendants moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)"), arguing that "Plaintiff's claims are barred by Heck v. Humphrey, 512 U.S. 477 (1994) and its progeny." (Docket Entry 58 at 1[.]

(Docket Entry 69 at 1-9 (certain internal brackets, ellipses, quotation marks, and parentheses omitted).)

The Court (per the undersigned) recommended denial of the Motion for Judgment on the Pleadings (see id. at 30), which the Court (per Judge Eagles) adopted (Docket Entry 73). Thereafter, Defendants filed a Notice of Intent to File Dispositive Motions (Docket Entry 74), and then, the Summary Judgment Motion and Supporting Brief (Docket Entry 76; Docket Entry 77). On January 3, 2023, the Clerk sent Plaintiff a letter advising him of his "right to file a 20-page response in opposition . . . within 30 days from the date of service of [Summary Judgment M]otion upon [him]." (Docket Entry 79 at 1.) The letter specifically cautioned Plaintiff that a "failure to respond or . . . file affidavits or evidence in rebuttal within the allowed time may cause the [C]ourt to conclude that [ D]efendants' contentions are undisputed and/or that [Plaintiff] no longer wish[es] to pursue the matter," as well as that, "unless [Plaintiff] file[s] a response in opposition to

5

the [Summary Judgment M]otion, it is likely . . . summary judgment [will be] granted in favor of [Defendants]." (<u>Id.</u>)

Despite these warnings, Plaintiff did not respond. (<u>See</u> Docket Entries dated January 3, 2023, to present.) Given that lack of response and the fact that Plaintiff did not verify the factual allegations in the Complaint (<u>see</u> Docket Entry 18 at 34 (certification that "the factual allegations have evidentiary support" for purposes of Federal Rule of Civil Procedure 11)), Plaintiff's bare allegations cannot controvert facts which the Summary Judgment Motion or record establish. <u>See</u> <u>Custer v. Pan Am. Life Ins. Co.</u>, 12 F.3d 410, 416 (4th Cir. 1993) (recognizing that party's failure "to respond to a summary judgment motion may leave uncontroverted those facts established by the motion").[1] For the reasons that follow, no genuine issue of material fact remains and the Court should grant the Summary Judgment Motion.[2]

---

1 By local rule, "[i]f a respondent fails to file a response within the time required . . ., the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." M.D.N.C. LR 7.3(k). However, the Fourth Circuit requires substantive review of even unopposed motions for summary judgment. <u>See</u> <u>Custer</u>, 12 F.3d at 416 ("[T]he court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.").

2 After conducting an initial review of the Complaint, the Court expressly allowed Plaintiff's claims for involuntary custodial interrogation and malicious prosecution to proceed. (<u>See</u> Docket Entry 4 at 7-9; <u>see also</u> Docket Entry 7 at 1 (adopting Docket Entry 4).) In doing so, the Court noted certain other allegations, which conceivably could pertain to a claim for

## II. DISCUSSION

### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "draw[s] all reasonable inferences in favor of the non-moving party. Emmons v. City of Chesapeake, 982 F.3d 245, 250 (4th Cir. 2020). However, "[u]nsupported speculation is not sufficient to

---

fabrication of evidence (see id. at 7-9, 11, 13), as well as "possible state law claims" (id. at 4 n.3). The Court, however, described those allegations/potential claims as "somewhat conclusory . . . [and] not specific" (id. at 9), and as "hardly a model claim" (id. at 13; see also id. at 4 n.3 (stating that "any possible state law claims should remain matters **for the parties to address**") (emphasis added)). Accordingly, Plaintiff bore the burden of further developing any claim for fabrication of evidence, and any possible state law claims, which he failed to do. Tellingly, when Defendants filed their Summary Judgment Motion, wherein they addressed Plaintiff's claims for involuntary custodial interrogation and malicious prosecution, **but not fabrication of evidence or any state law claims**, Plaintiff elected not to file a reply or otherwise produce support for fabrication of evidence or any state law claims. As a result, the Court should deem Plaintiff to have abandoned any such claims. See Brown v. Novant Health, Inc., No. 1:05CV01069, 2007 WL 1521465, at *1 n.2 (M.D.N.C. May 23, 2007) (noting that party may abandon theory at summary judgment stage).

defeat a summary judgment motion." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987)). Rather, the Court must "find that a reasonable jury could return a verdict for [the nonmoving party in order for] a genuine factual dispute [to] exist[] . . . ." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996).

## B. Involuntary Custodial Interrogation

Plaintiff's first claim involves what he describes as an "unconstitutional interrogation." (Docket Entry 18 at 13.) According to the Complaint, Defendant Henry "approach[ed Plaintiff] and[,] without informing [him] of the serious allegations against [him,] proceeded to mislead and deceive [him] by stating that [t]he reason[] for approaching [him] was concerning a moped." (<u>Id.</u> at 14.) The Complaint contends further that, "after 30 or 40 minutes in the cold of [Plaintiff] refusing to go with [Defendant Henry] without probable cause, [Defendant Henry] conspired with [another officer ] to get [Plaintiff] to the police station and make a statement which could establish grounds for probable cause." (<u>Id.</u>) In sum, Plaintiff alleges that Defendant Henry either coerced or deceived Plaintiff into going to the police station to make a statement regarding an incident involving a moped, making the ensuing interview an involuntary custodial interrogation, and violating Plaintiff's "privilege against self-incrimination" (<u>see</u> <u>id.</u>).

8

Defendants' Supporting Brief rejects the premise that Plaintiff "was [] subjected to an involuntary custodial interrogation." (Docket Entry 77 at 15.) Defendants emphasize that Plaintiff voluntarily "went to the police station for the interview" (id. at 16), rendering the interview "noncustodial" (id.). Defendants argue further that, even if Defendant Henry failed to reveal the true nature of the investigation to Plaintiff, "misleading statements, misleading ploys, deception or minor fraud by officers do[] not automatically render a confession involuntary." (Id. (citing United States v. Umana, 750 F.3d 320, 344-45 (4th Cir. 2014)).) As a result, the Supporting Brief maintains that Plaintiff's statements during the interview, voluntarily made, do not implicate his privilege against self-incrimination. (See id.)

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; see also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States"). "A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (internal quotation marks omitted). Under the Due Process clause, "[t]he test [for determining the voluntariness of a statement] is whether

9

the [statement] was extracted by any sort of threats or violence, or obtained by any direct or implied promises . . . or by the exertion of any improper influence," Hutto v. Ross, 429 U.S. 28, 30 (1976) (internal quotation marks and parentheticals omitted), such that the defendant's "will has been overborne and his capacity for self-determination critically impaired," Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). Further, in evaluating the voluntariness of a statement, courts should consider "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987).

Although ostensibly coercive, "[p]loys to mislead a suspect or lull him into a false sense of security" do not rise to the level of a constitutional transgression. Illinois v. Perkins, 496 U.S. 292, 297 (1990). Relatedly, an officer "ha[s] no duty to advise [a suspect] of the identity of the specific offense under investigation." Braxton, 112 F.3d at 784. Even so, an officer's "failure to inform a defendant that he was the subject of the investigation when the defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead results in affirmative deceit." United States v. Giddins, 858 F.3d 870, 883 (4th Cir. 2017) (internal brackets and ellipses omitted). And affirmative "deceit . . . constitutes coercion." Id. at 884. In the absence of affirmative deceit, "[t]he determinative

factor remains the question of whether [any] misrepresentations overbore the defendant's will." United States v. Whitfield, 695 F.3d 288, 302 (4th Cir. 2012).

The record here reflects the absence of a genuine issue of material fact regarding the voluntariness of Plaintiff's statements to Defendants. As body camera footage Defendants submitted along with their Supporting Brief shows (see, e.g., Docket Entry 77-1 at 7), Defendant Henry first approached Plaintiff in Winston-Salem, North Carolina, the evening of February 17, 2015. In the footage, the sun has set, streetlights illuminate the roads and sidewalks, and snow covers much of the ground. Audio begins approximately 30 seconds into the video as Defendant Henry walks towards his patrol car along with Plaintiff. In the first question the footage captures, Defendant Henry asks Plaintiff, "[s]o where is the moped supposed to be at?" Plaintiff replies that he borrowed the moped, but cannot return it because he "do[es]n't have the keys or helmet." Defendant Henry then enters his vehicle while Plaintiff waits outside (off camera), makes a telephone call (presumably to a supervisor), and states that Plaintiff "gave [Defendant Henry] a fake name," and that "CID wants to talk to him but . . . [he] do[es]n't have any warrants to do anything." Defendant Henry later says over the telephone that Plaintiff "thinks we're out here looking for a moped," and that he "hasn't broached anything else" with Plaintiff. The voice on the other end of the telephone,

audible in the body camera footage, responds that Defendant Henry should "see if [Plaintiff] wants to talk."

After the call concludes, Defendant Henry approaches Plaintiff and says "[h]ere's the deal . . . the moped could be a serious charge. It could be like a felony. . . . Will you come down with me down to the police department, no handcuffs, you're not under arrest, just coming down to talk with me about that moped. . . . It's better for you, trust me." Plaintiff initially expresses some reluctance due to his concern that getting in a police car could reflect guilt of something, and asks whether Stephanie Leonard (his then-girlfriend) "can drive [him] down" to the station. Defendant Henry responds that he heard "there was some stuff that went on last night, where you guys had some problems," so Plaintiff should ride down with an officer instead. Plaintiff acknowledges something occurred, responding, "OK. That's what I'm saying. For sure." Defendant Henry continues that by stating that, "[w]e're gonna talk about everything; we want to talk about what happened last night, we're gonna talk about this moped, we want to get everything straightened out." Defendant Henry adds that "[Plaintiff is] not under arrest . . . [and is] voluntarily coming down. If [Plaintiff] want[s] to get up and say 'you know what, I'm out,' then [Defendant Henry] can't stop [him]." Plaintiff then agrees to come in for questioning, clarifying that, "if [he is] to get in the car, willingly," Defendants should not construe that as

12

any admission of guilt. Defendant Henry's conversation with Plaintiff lasts approximately four minutes. The entire exchange (including Defendant Henry's two telephone calls from his patrol car) spans only 15 minutes, not 30-40 minutes as Plaintiff alleged (see Docket Entry 18 at 13).

Additional footage Defendants submitted with their Supporting Brief contains the interview of Plaintiff at the police station. (See, e.g., Docket Entry 77-1 at 9.)[3] After entering the interview room at approximately 9:04pm, Plaintiff and an officer sit and engage in casual conversation while waiting for detectives to arrive. Plaintiff, not in handcuffs or any form of restraints, appears relaxed and in good spirits. Eventually, at approximately 9:43pm, Defendants (and detectives) Johnson and Sullivan arrive. As the officer who had waited with Plaintiff leaves the interview room, Plaintiff shakes his hand goodbye, smiles, and tells him to "be safe out there."

Defendant Johnson then begins the interview at 9:44pm by asking, "[n]ow, you are down here voluntarily?" Plaintiff responds, "[y]es, sir." Defendant Johnson continues, "[t]his is a secure location. It took a key to get in, but there's no key to get out. So, anytime you can walk out. The door is unlocked." Plaintiff responds, "OK." Defendant Johnson goes on to state,

---

3 This footage, unlike the body camera footage, contains time-stamps, so references to this footage will include the times at which various individuals made statements.

13

"[y]ou basically just, answer whatever questions that you feel that you want to answer." Plaintiff responds, "[t]hey keep saying I can leave when I want to . . . I'm fine with whatever you're doing. It's fine with me." The interview proceeds from there, and at no point does Plaintiff refuse to answer a question or ask to leave.[4]

Accordingly, the record reflects that, although Defendant Henry may have initially deceived Plaintiff by telling him officers wished to question him regarding the moped, and by arguably misrepresenting the seriousness of the potential charge, see N.C.G.S. § 14-72.2. ("unauthorized use of a motor-propelled conveyance is a Class 1 misdemeanor"), Defendant Henry cured any misconception Plaintiff may have had by the time Plaintiff agreed to accompany officers to the station for questioning. When Plaintiff asked whether Ms. Leonard could drive him to the station, Defendant Henry responded that he heard "there was some stuff that went on last night, where you guys had some problems," so Plaintiff should ride down with an officer instead. Defendant Henry added that officers wanted to "talk about everything," *including* "what happened last night." Defendant Henry had no affirmative "duty to advise [Plaintiff] of the identity of the specific offense under

_____

4 Several minutes into the interview, Plaintiff admits he has consumed "two 40[oz bottle]'s [of beer or malt liquor]," at which point Defendant Sullivan pauses the interview to ask whether Plaintiff "feel[s] like he's drank too much and shouldn't be in here talking to" detectives. Plaintiff responds, "no, y'all are fine." Throughout the interview, Plaintiff's "behavior . . . did not suggest impairment," Pelton, 835 F.2d at 1073.

14

investigation, <u>Braxton</u>, 112 F.3d at 784, and, in any event, Defendant Henry did not "fail[] to inform [Plaintiff] that he was the subject of the investigation," <u>Giddins</u>, 858 F.3d at 883. The record reflects that, when Plaintiff agreed to submit to questioning from officers, he understood the scope of questioning to include both the moped and an incident with Ms. Leonard from the prior evening. Plaintiff's unverified allegations to the contrary do not create a genuine issue of material fact. <u>See</u> <u>Custer</u>, 12 F.3d at 416.

In addition, Defendant Henry's statement that "it's better for [Plaintiff]" to come down to the station for questioning did not render Plaintiff's subsequent statements involuntary. The United States Court of Appeals for the Fourth Circuit "ha[s] consistently declined to hold categorically that a suspect's statements are involuntary simply because police deceptively highlight the positive aspects of confession." <u>Umana</u>, 750 F.3d at 344. Defendant Henry here made "no specific promises of leniency." <u>United States v. Mashburn</u>, 406 F.3d 303, 309 (4th Cir. 2005). Put another way, "[g]eneral encouragement to cooperate is far different from specific promises of leniency." <u>Pelton</u>, 835 F.2d at 1073. The former represents constitutionally-permissible law enforcement conduct; the latter may not. Defendant Henry's statement to Plaintiff falls into the former category. <u>See</u> <u>United States v. Leonard</u>, No. 97-4266, 141 F.3d 1161 (table), 1998 WL 163735, at *5

15

(ruling that law enforcement officer's "use[ of] the word 'guarantee' in relation to his representations that a court would look favorably upon a decision by [the defendant] to cooperate, and would be less likely to 'hammer' [him] than if he forced a drawn out investigation" did "not amount to a coercive promise of leniency" because the notion "[t]hat a suspect's cooperation, by lightening the government's burdens of investigation and prosecution, is looked upon favorably by prosecutors and judges is very close to being a truism" (some internal quotation marks omitted)).

Finally, even if the Court concluded that Defendant Henry deceived Plaintiff and did not rectify Plaintiff's misconception, the Court should still find that Plaintiff's interview (and statements made therein) contained voluntary admissions because Defendant Johnson made clear, immediately before the interview commenced, that Plaintiff "[was] down here voluntarily," that "it took a key to get in, but there's no key to get out," and that Plaintiff could "answer whatever questions that [he felt] that [he] want[ed] to answer." To each of those statements, Plaintiff responded affirmatively. See, e.g., United States v. Hill, 649 F.3d 258, 268 (4th Cir. 2011) (holding that "an individual's consent can be sufficient to dissipate the taint of a[ Fourth Amendment violation]"); United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998) (noting that "an intervening act of free will may

16

purge the primary taint" of constitutional violation (internal brackets and quotation marks omitted)).[5]

Importantly, and to repeat, the relevant test "is whether the **confession** was extracted by any sort of threats or violence, or obtained by any direct or implied promises . . . or by the exertion of any improper influence." Hutto, 429 U.S. at 30. Here, immediately prior to Plaintiff's self-incrimination, Defendant Johnson stated unequivocally that Plaintiff (1) came to the station voluntarily, (2) could leave any time, and (3) could refuse to answer any question. Given the totality of the circumstances (that Defendant Henry revealed the intent to question Plaintiff about not just the moped, but also his conflict with Ms. Leonard before Plaintiff agreed to submit to questioning, and that Defendant Johnson repeatedly emphasized the voluntary nature of the interview), the Court should not conclude that Plaintiff's "will [was] overborne and his capacity for self-determination critically impaired" see Schneckloth, 412 U.S. at 225. The Court should therefore hold that Defendants Henry and Johnson did not subject

---

5 Notably, in ruling on a pretrial motion to suppress Plaintiff's interview, the state court trial judge concluded that "[e]verything that occurred down at the Police Department [] was sufficient to purge any of the taint of the statements that were made to [Plaintiff] in order to get [him] to accompany [Defendant] Henry to the Police Department")). (Docket Entry 77-2 at 168.)

Plaintiff to an involuntary custodial interrogation, and grant Defendants summary judgment as to this claim.[6]

## C. Malicious Prosecution

Plaintiff's second (and final) claim best resembles the common law tort of malicious prosecution. (See Docket Entry 4 at 8.) According to the Complaint, while investigating Plaintiff, Defendant Johnson fabricated a police report (see Docket Entry 18 at 16), disregarded certain pieces of evidence (see id.), and destroyed exculpatory evidence (see id. at 17). The Complaint alleges further that Defendant Felske instructed Ms. Leonard to describe the incident as a sexual assault (see id. at 18), allowed her to "destroy the evidence of a crime scene" (id. at 19), and otherwise failed to preserve certain evidence (see id.). As a result, the Complaint argues that Defendants' misconduct "led to a lack of presumption of innocence, excessive bail, wrongful and an extensive incarceration and prosecution which ultimately contributed to an unlawful conviction at a[n] unfair trial and

_____

6 During initial screening, the Court (per the undersigned) did not adopt Plaintiff's theory that any failure to inform Plaintiff of his right to counsel, "or [Plaintiff's inability] to have counsel present" (Docket Entry 18 at 14), factored into his involuntary custodial interrogation claim. And in fact, precedent forecloses such a theory. See Vega v. Tekoh, __ U.S. __, __, 142 S. Ct. 2095, 2107–08 (2022) (holding that failure to Mirandize suspect does not confer Section 1983 cause of action because exclusion of unwarned statements represents adequate remedy). Accordingly, Defendants properly did not address this theory in their Supporting Brief (see generally Docket Entry 77), and the Court need not consider it for purposes of summary judgment.

18

sentencing which accumulated to over 30 months of jail - parole and prison time." (Id. at 17.) In short, Defendants allegedly instigated a malicious prosecution of Plaintiff.

A malicious prosecution claim requires a showing of "both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure." Snider v. Seung Lee, 584 F.3d 193, 199 (4th Cir. 2009). Defendant's Supporting Brief contends that Plaintiff can satisfy neither element. (See Docket Entry 77 at 18-22.) As to the first element, the Supporting Brief argues that Plaintiff cannot establish an unreasonable seizure because probable cause existed at the time of his arrest. (See id. at 20.) The Supporting Brief then incorporates and restates Defendants' arguments regarding the lack of favorable termination from their Motion for Judgment on the Pleadings. (See id.; see also Docket Entry 72 at 4-6, 13-16.) Because probable cause supported Plaintiff's arrest, Defendants are entitled to judgment as a matter of law on Plaintiff's malicious prosecution claim, and the Court need not determine whether the relevant criminal proceedings terminated favorably.[7]

---

[7] In that regard, the Court may observe that Defendants continue to rely upon the argument that "Plaintiff's compromise resolution of the relevant criminal proceedings against him did not in any way indicate or suggest that Plaintiff was innocent of the charges." (Docket Entry 59 at 8.) But "[t]o demonstrate a favorable termination of a criminal prosecution for purposes of [a] Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." Thompson v. Clark, __ U.S. __, __, 142 S. Ct. 1332,

19

The Fourth Amendment to the Constitution protects people from unreasonable seizures. See Wilson v. Arkansas, 514 U.S. 927, 934 (1995) (describing requirement of reasonableness as "flexible"). "To establish an unreasonable seizure under the Fourth Amendment, [Plaintiff] needs to show that the officers decided to arrest [him] . . . without probable cause." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002). A showing of probable cause requires that "the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984). "[P]robable cause is a fluid concept," Illinois v. Gates, 462 U.S. 213, 232 (1983), judged by the "totality-of-the-circumstances," id. at 230.

An officer's personal observations can suffice to establish probable cause for an arrest. See United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995) (officer's observation of vehicle which traveled repeatedly to confidential informant's hotel and engaged in "counter-surveillance driving tactics" provided probable cause). Where the arresting officer did not personally observe the offense at issue, "it is difficult to imagine . . . better evidence of probable cause than an identification by name of [the] assailant[] provided by a victim." Torchinsky v. Siwinski, 942

1335 (2022). Plaintiffs need *not* "show that the criminal prosecution ended with some affirmative indication of innocence." Id. at 1341.

F.2d 257, 262 (4th Cir. 1991); see also Williams v. Wright, No. 6:10-CV-2844, 2011 WL 6700373, at *7 (D.S.C. Nov. 2, 2011) (recommending summary judgement in favor of defendant where plaintiff challenged probable cause underlying his arrest by impugning accuser's motives in making statement to police, but did not submit any proof "that the victim's motive or unreliability should have been apparent to" officers), recommendation adopted, No. 6:10-2844, 2011 WL 6699448 (D.S.C. Dec. 22, 2011).

In addition, an individual's description of his conduct to law enforcement, when such conduct reasonably appears to violate a law, provides probable cause for a subsequent arrest. See Brown v. Belt, No. 2:15-CV-11549, 2019 WL 1648867, at *5 (S.D.W. Va. Apr. 15, 2019) (probable cause supported burglary arrest where apartment property manager admitted he "let another man into the apartment of a resident . . . to take personal property from that apartment"). Furthermore, because courts review the existence of probable cause from the totality of the circumstances, see Gates, 462 U.S. at 232, "an officer's practical experience and the inferences the officer may draw from that experience" must factor into the calculus, United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004).

In effectuating an arrest, officers only "need probable cause that a crime has been committed, not that the criminal defendant committed all of the crimes for which he or she is later charged." Calusinski v. Kruger, 24 F.3d 931, 935 (7th Cir. 1994); see also

District of Columbia v. Wesby, __ U.S.__ , __ , 138 S. Ct. 577, 585 n.2 (2018) (noting that "an arrest is lawful if the officer had probable cause to arrest **for any offense**, not just the offense cited at the time of arrest or booking") (emphasis added). Simply put, "[p]robable cause need only exist as to any offense that could be charged under the circumstances." McMillian v. LeConey, No. 5:09-CV-175, 2011 WL 2144628, at *8 (E.D.N.C. May 31, 2011) (quoting Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994)), aff'd, 455 F. App'x 295 (4th Cir. 2011). Because, "[f]or fourth-amendment purposes, an arrest on multiple charges is a single transaction," Wilkerson v. Hester, 114 F. Supp. 2d 446, 456 (W.D.N.C. 2000), the task for a reviewing court consists merely of determining "that there was probable cause to arrest for at least one charge," Johnson v. City of Greenville, No. 4:15-CV-00064, 2015 WL 7854564, at *7 (E.D.N.C. Dec. 3, 2015).

In the absence of a warrant, North Carolina law permits an officer to arrest "any person who the officer has probable cause to believe (1) has committed a criminal offense in the officer's presence, or (2) has committed a felony." State v. Hardy, 31 N.C. App. 67, 69 (1976). By statute, North Carolina also permits warrantless arrests for certain misdemeanors (if supported by probable cause). See N.C.G.S. § 15A-401(b)(2)(d). Misdemeanor assault constitutes one of the offenses for which an officer may make a warrantless arrest. See id.; see also N.C.G.S. § 14-33(a).

22

Plaintiff's admissions during his interview with Defendant Johnson provide probable cause to support his arrest for misdemeanor assault. In the security footage (see, e.g., Docket Entry 77-1 at 9) of Plaintiff's interview that Defendants submitted, at approximately 10:27pm, Plaintiff begins recounting the events of the evening of February 16, 2015. At 10:36pm (in the security footage), Plaintiff states that he grew frustrated with Ms. Leonard when they left their residence the prior evening to go buy cigarettes, and Ms. Leonard apparently said that she also wanted to walk to a separate store to purchase wine. Defendant Johnson asks Plaintiff if there "was any way [he] tried to relay how upset [he] was?" Plaintiff responds " yea . . . I pushed her. . . . She fell down." Plaintiff continued by stating that "[he is] wrong for pushing her, [he] know[s] that."

At 10:46pm, the interview turns to what happened when Plaintiff and Ms. Leonard returned to their residence. Plaintiff recounts that "[w]e did get into a tussle." When Defendant Sullivan asks what a tussle entails, Plaintiff responds that "[i]t got crazy man, I'm not going to sit here and lie to y'all." At 10:48pm, Plaintiff admits that "[he] got little more aggressive than usual," and that "[he] swung at her, you know, backhanded her . . . and it caught her in the face." At 10:51pm, Plaintiff states that "we got into a fight man, real talk man." At 10:57pm, Plaintiff says that "[he] know[s] what he did was wrong," but

denies striking Ms. Leonard more than once, stating at 10:59pm that "I just popped her in the mouth, and the rest of it was tussling." At 11:11pm, while Plaintiff describes what ensued after his "tussle" with Ms. Leonard, he recounts that he took her to get cleaned up and that "she spit blood when we w[ere] in the bathroom."

By admitting that he pushed Ms. Leonard to the ground, and struck her in the face, Plaintiff provided probable cause to Defendant Johnson sufficient to support Plaintiff's subsequent arrest for assault. See Brown, 2019 WL 1648867, at *5; see also State v. Davis, 68 N.C. App. 238, 244 (1984) ("An assault is an overt act . . . with force and violence, to do some immediate physical injury to the person of another sufficient to put a reasonable person in fear of immediate bodily harm." (internal brackets, quotation marks, and ellipses omitted)). Even in the absence of a warrant, North Carolina by statute permits warrantless arrests for misdemeanor assault. See N.C.G.S. § 15A-401(b)(2)(d). Because officers only "need probable cause that a crime has been committed, not that the criminal defendant committed all of the crimes for which he or she is later charged," Calusinski, 24 F.3d at 935, and because the task for a reviewing court consists merely of determining "that there was probable cause to arrest for at least one charge," Johnson, 2015 WL 7854564, at *7, a finding of probable cause as to Plaintiff's misdemeanor assault charges should

24

defeat Plaintiff's malicious prosecution claim.  Accordingly, the
Court should grant Defendants summary judgment on Plaintiff's claim
for malicious prosecution.[8]

---

8 This recommended conclusion, however, does not in any way
suggest the absence of probable cause as to the other charges
Plaintiff faced.  Quite the contrary - body camera footage
Defendants submitted with their Supporting Brief includes
statements from Ms. Leonard to Defendant Felske.  In Defendant
Felske's body camera footage (see, e.g., Docket Entry 77-1 at 4),
he approaches Ms. Leonard outside of a BP gas station the morning
of February 17, 2015.  When Defendant Felske asks Ms. Leonard what
happened the prior night, she reports that "there's blood all over
my carpet, my bed;" "[Plaintiff] hit [her] so hard [she] do[es]n't
even remember what he was saying;" "[Plaintiff] choked [her];"
"[Plaintiff] openhanded-ly hit [her] so hard that [she] fell
sideways into the snow;" Plaintiff hit her "probably 20, 30 times;"
"[she] has bruises all over her, [she] can barely walk;"
"[Plaintiff] was choking [her and] covering [her] mouth, trying to
suffocate [her] with a pillow;" "[Plaintiff] bit [her] fingers;"
and "[Plaintiff] was trying to shove his fingers down [her]
throat."  In the footage, Ms. Leonard has visible lacerations on
her face and hands.  She continues recounting the events of
February 16, stating that "[Plaintiff] stripped [her] naked;"
"[she] guesses she fell asleep or something, [she] woke up and
[Plaintiff] was having sex with [her];" "[she] said 'stop, don't do
this,' and [Plaintiff] said 'shhh, be quiet;'" "[Plaintiff] tried
to make [her perform oral sex on him];" "[she] said, 'no, I cant,'
because of [her] mouth, and because [she] didn't want to;" and
"[Plaintiff] had sex with [her]," as "[she] was crying" and saying
"no, stop."  Ms. Leonard identifies Plaintiff by name and provides
his date of birth to Officer Felske.  As previously noted, "it is
difficult to imagine . . . better evidence of probable cause than
an identification by name of [the] assailant[] provided by a
victim."  Torchinsky, 942 F.2d at 262.  Additionally, Plaintiff
provided no evidence that "that the victim's motive or
unreliability should have been apparent to" officers, Williams,
2011 WL 6700373, at *7, beyond his vague and conclusory allegations
of a conspiracy against him, which do not suffice at this stage,
see Custer, 12 F.3d at 416.  In sum, although the Court certainly
could conclude probable cause supported all the charged offenses,
it need only find probable cause as to the assault charge in order
to dispose of Plaintiff's malicious prosecution claim.  See, e.g.,
Calusinski, 24 F.3d at 935; Johnson, 2015 WL 7854564, at *7.

**<u>CONCLUSION</u>**

Because the record lacks evidence from which a reasonable fact-finder could conclude that Defendants subjected Plaintiff to an involuntary custodial interrogation, or that Defendants maliciously prosecuted Plaintiff, Defendants have shown entitlement to judgment as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 76) be granted.

This 27th day of February, 2023.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
